UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RICARDO B. GURROLA and | ) | |
| MARLEINET T. GURROLA, on behalf of | ) | |
| themselves and all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 23-cv-3438 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| FORD MOTOR COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Ricardo and Marleinet Gurrola bought a recreational vehicle built on a Ford chassis, called a Cutaway, in March 2022. They rolled around, going here and there, exploring the open road and looking for America. After a few months and a few thousand miles, they noticed that their RV was consistently pulling to one side. Driving became more work and less recreation, more maintenance and less leisure.

The Gurrolas went to see a mechanic. The vehicle came with a warranty that required service at a Ford dealership, so they took their RV to a local dealer, Hawk Ford. After taking a look, Hawk Ford discovered that the wheel alignment was off.

Things went from bad to worse. Hawk Ford couldn't adjust the alignment because that fix would require aftermarket parts, meaning replacement parts not made by Ford. And installing aftermarket parts would void the Ford warranty.

So the Gurrolas went their own way. They purchased aftermarket parts and had them installed, paying $1,836 for the fix. But the Gurrolas don't want to get stuck with the tab. They believe that Ford should cover the alignment under the warranty.

The Gurrolas filed suit against Ford on behalf of themselves and a class of RV owners. They bring four warranty-based claims and a state-law consumer-protection claim. Ford moved to dismiss the complaint in its entirety for failure to state a claim.

For the reasons stated below, Ford's motion to dismiss is granted.

## Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

In March 2022, Ricardo and Marleinet Gurrola purchased a recreational vehicle from General RV in Huntley, Illinois. *See* Am. Cplt., at ¶ 16 (Dckt. No. 45). That RV was built on a Ford chassis, known as a "Cutaway." *Id.* at ¶¶ 16, 23. A chassis is the skeletal framework of a vehicle – it is the load-bearing frame that provides the backbone for everything else. The Gurrolas bought an RV with a 2022 Ford E-Series Cutaway. *Id.* at ¶ 16.

Before getting too deep into the story, the Court will take a detour and offer some background about Cutaways.

As everyone knows, Ford Motor Company designs, manufactures, distributes, and sells automobiles. *Id.* at ¶ 21 (Dckt. No. 45). Ford practically invented the mass assembly of vehicles. Stories of Henry Ford, mass production, and the Model T are staples of high-school history classes across the nation.

What the reader may not know is that Ford also manufactures incomplete vehicle chassis that third-party manufacturers later use to build completed vehicles. *Id.* at ¶ 23. These vehicle

frames are known as Cutaways.  *Id.* at ¶ 2.  Looking at a picture of a Ford Cutaway, it is not hard

to figure out the reason for the name.  A Cutaway looks like a vehicle that has had a portion cut

away.  It looks like a half-completed Lego:



*Id.* at ¶ 23.

A Cutaway is what's known as an "incomplete vehicle."  *Id.* at ¶ 2.  That might seem

obvious from the picture, but it's actually a term of art.

Under federal regulations, an "incomplete vehicle" is an "assemblage consisting, at a

minimum, of chassis (including the frame) structure, power train, steering system, suspension

system, and braking system, in the state that those systems are to be part of the completed

vehicle, but requires further manufacturing operations to become a completed vehicle."  *See* 49

C.F.R. § 567.3; *see also* Am. Cplt., at ¶¶ 3, 24 (Dckt. No. 45).

Cutaways include an engine and a drivetrain.  *See* Am. Cplt., at ¶ 23 (Dckt. No. 45).  To

turn a Cutaway into a vehicle that consumers can use, another manufacturer must add the rest of

the vehicle and complete the job.  *Id.* at ¶¶ 2, 4.

Ford manufactures its E-Series Cutaways as incomplete vehicles and then sells them to

"final-stage manufacturers," who turn them into "completed vehicles."  *See* Am. Cplt., at ¶ 3

(Dckt. No. 45) (cleaned up).  Third-party manufacturers build a vehicle body on top of the

Cutaway frame to make finished RVs, dump trucks, ambulances, or other vehicles.  *Id.* at ¶ 23.

A completed RV on a Ford Cutaway looks like any RV that one might see cruising

America's highways.  The complaint includes a snazzy picture:



*See* Am. Cplt., Ex. B, at 9 (Dckt. No. 45-2).

The exact specifications of a Cutaway, known as a "prep package," depend on the type of

vehicle that it will become.  *See* Am. Cplt., at ¶ 4 (Dckt. No. 45).  So the specifications for an RV

will differ from the specifications for, say, an ambulance.

When Ford delivers a Cutaway to the final-stage manufacturer, it must include the

frame's "gross vehicle weight rating," which goes by the acronym "GVWR."  *Id.* at ¶ 5 (citing 49

C.F.R. § 571.3(b)); *id.* at ¶ 25.  The GVWR is the maximum weight that a vehicle can safely

handle.  *Id.* at ¶ 5.  The GVWR must account for the weight of a "fully loaded vehicle, including

all cargo, fluids, passengers, and optional equipment intended to represent the heaviest weight

the vehicle chassis is designed to safely carry."  *Id.* at ¶ 25.

When Ford sells a Cutaway to a final-stage manufacturer, Ford is responsible for

delivering a Cutaway that is capable of carrying the advertised GVWR.  *Id.* at ¶¶ 8, 41.  The

4

final-stage manufacturer cannot alter the suspension without voiding Ford's warranty to the end consumer. *Id.* at ¶ 10 n.1.

The Gurrolas bought a 2022 RV that was built on a E-450 Dual-Rear Wheel Cutaway. That Cutaway was designed and advertised to accommodate a GVWR of 14,500 lbs. *Id.* at ¶¶ 16–17, 27–29; Am. Cplt., Ex. A, at 2 (Dckt. No. 45-1). It also came with two "prep packages" designed for RVs: the aptly named "motorhome prep package []" and "modified motorhome package." *See* Am. Cplt., at ¶¶ 4, 17 (Dckt. No. 45).

Their Cutaway also came with a "Twin I-Beam Independent Front Suspension" as standard equipment. *Id.* at ¶ 18; Am. Cplt., Ex. A, at 2 (Dckt. No. 45-1).

According to a Ford advertisement for the 2021 model year, the E-Series suspension also came "with caster/camber adjustment." *See* Am. Cplt., at ¶¶ 18, 38 (Dckt. No. 45). And that's where the problems began for the Gurrolas.

Their RV didn't come with a suspension with an adjustable caster/camber. Instead, the Gurrolas received "the exact opposite: a fixed caster camber," incapable of adjustment. *Id.* at ¶ 18. The Gurrolas didn't get what they believe they were promised. Their RV's suspension did not allow for any adjustment. *Id.* at ¶ 39.

To explain why a "fixed caster camber" could pose a problem, the Court must take another side road into the realm of automotive mechanics. *Id.* at ¶ 18.

Caster and camber are measures of a vehicle's wheel alignment. Without the right alignment, a vehicle will not drive correctly. So the ability to make adjustments is important. "The ability to adjust caster and camber is crucial to alignment of the vehicle, which impacts the amount of weight the vehicle can safely carry." *Id.* at ¶ 34.

Proper caster "ensures good stability, helps maintain straight-ahead direction and promotes steering wheel self-centering." *Id.* at ¶ 33. A vehicle with improper caster "will wander and weave on the road, requiring constant correction in steering." *Id.*

Similarly, proper camber distributes the weight of a vehicle evenly across the width of a tire tread. *Id.* at ¶ 32. Improper camber "makes the tire wear on one edge and causes the vehicle to pull to the side . . . ." *Id.*

Adding weight to a vehicle will alter its caster and camber as the springs in the suspension begin to carry the load. *Id.* at ¶ 35. The more weight on the chassis, the more the suspension springs will sag. *Id.* at ¶ 34. Sagging springs can throw off the caster and camber, creating problems for the driver. *Id.*

Extra weight might throw things off, and create a need for an adjustment. But if the caster and camber can't be adjusted, the extra weight could cause the vehicle to pull and weave. *Id.* "[W]ithout any adjustability, the result is that the vehicle will pull to one side and not safely track the road." *Id.* at ¶ 39.

That's what happened to the Gurrolas. After a few months and a few thousand miles, the Gurrolas noticed that their RV would regularly pull to the right. *Id.* at ¶ 19.

This pulling "threatens the health and safety of the vehicle operator and its occupants." *Id.* at ¶¶ 80, 89. The Gurrolas' RV did not operate safely at the advertised GVWR. *Id.* And it did not provide the "great ride, steering, and handling" that Ford advertised. *Id.* at ¶ 37.

The Gurrolas sought repairs under an express warranty that Ford provided for its E-Series Cutaway, called the New Vehicle Limited Warranty. *Id.* at ¶¶ 70–72; Def.'s Mem. in Supp. of Mtn. to Dismiss, at 3 (Dckt. No. 49); *see also* Def.'s Mem., Ex. 1, at 11–23 (Dckt. No. 49-1). The Gurrolas hoped to adjust the camber and caster, and get their RV back on the open road.

The warranty instructed the Gurrolas to seek repairs at an authorized Ford dealership. *See* Am. Cplt., at ¶ 22 (Dckt. No. 45) ("Per the agreements between [Ford] and the authorized dealers, consumers such as [the Gurrolas] can receive services under Ford's issued warranty at dealer locations that are convenient to them.").

So the Gurrolas took their RV to Hawk Ford, a local dealer. *Id.* at ¶ 19. Hawk Ford inspected the RV, charging the Gurrolas $82.50. *Id.* But Hawk Ford did not fix the pulling because the suspension was not adjustable by itself. *Id.* at ¶ 18.

Instead, the caster and camber could only be adjusted by installing aftermarket parts, which would void the warranty. *Id.* at ¶¶ 10, 12, 39; Pls.' Resp. in Opp. to Mtn. to Dismiss, at 14–15 (Dckt. No. 51). Aftermarket parts are additional or replacement parts not manufactured by an original equipment manufacturer like Ford.

At that point, the Gurrolas had a few choices. One option was to do nothing – they could have stuck with the status quo, and rolled around the country with an RV that pulled to one side. Or, they could have reached out to Ford directly, and tried to find a fix. As another option, they could have asked for a second opinion from a different mechanic. Another possibility was to install aftermarket parts. Maybe there were other options, too.

The Gurrolas decided to go the route of the aftermarket parts. They paid $1,836 to install aftermarket parts on their RV's suspension. *See* Am. Cplt., at ¶¶ 12, 20 (Dckt. No. 45). The additional parts allowed them to adjust their RV's alignment and drive it safely at the advertised GVWR. *Id.*

The Gurrolas believe that they aren't the only ones driving an RV with a problematic suspension. In fact, they think that Ford knew all about the alleged design defect. The complaint points to posts on online forums for RV owners describing the use of aftermarket parts to adjust

7

the caster and camber of RVs built on E-Series Cutaways. *Id.* at ¶¶ 44–47. According to the complaint, "Ford concedes the only way to align the vehicle is for the consumer to purchase of [sic] aftermarket parts." *Id.* at ¶ 39.

So the Gurrolas rolled into the federal courthouse, bringing claims on behalf of themselves and a putative class of RV owners. They seek to represent a class of RV owners who "purchased or leased in the State of Illinois a completed motor home vehicle utilizing a Ford E-Series Cutaway [from] 2018" onward. *Id.* at ¶ 48.

The complaint includes five counts. The first claim falls under the federal Magnuson-Moss Warranty Act (Count I). The next three claims are warranty claims under state law, including breach of an express warranty (Count II), breach of the implied warranty of merchantability (Count III), and breach of the implied warranty of fitness for a particular purpose (Count IV). The last claim falls under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") (Count V). *Id.* at ¶ 13.

Ford moved to dismiss the complaint for failure to state a claim. *See* 8/4/23 Mtn. to Dismiss (Dckt. No. 12). An initial round of briefing ensued.

Meanwhile, the Sixth Circuit heard a related case about an RV built on a Ford Cutaway chassis that started pulling left. *See Boyle v. Ford Motor Co.*, 2024 WL 1406401 (6th Cir. 2024). The parties in the case at hand asked this Court to sit tight in the meantime. *See* 12/21/23 Joint Mtn. to Stay (Dckt. No. 26).

In *Boyle*, the Sixth Circuit addressed an express warranty similar to the Gurrolas' New Vehicle Limited Warranty. *See Boyle*, 2024 WL 1406401, at *2–4. The Court of Appeals ultimately ruled that the RV owner's express-warranty claim (under Florida law) failed. *Id.* at *4.

8

The Sixth Circuit also rejected a claim under a consumer-protection statute, holding that the need for aftermarket parts to fully align the RV's suspension was not deceptive or misleading. "[I]t is not plausible that Ford's statements would mislead reasonable consumers who know the Cutaway is an incomplete vehicle requiring many new parts to finish." *Id.* at \*6.

After *Boyle*, Ford renewed its motion to dismiss the Gurrolas' claims. *See* Def.'s Mtn. to Dismiss (Dckt. No. 48).

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). When considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678.

## Analysis

The outcome of the motion to dismiss the federal claim under the Magnuson-Moss Warranty Act depends on the outcome of the motion to dismiss the state-law warranty claims. So this Court will reshuffle the deck, and address the state-law claims first.

The Court will first analyze the express-warranty claim (Count II), followed by the implied-warranty claims (Counts III and IV). Next, the Court will address the Magnuson-Moss

9

Warranty Act claim (Count I).  Last, the Court will turn back to state law, and will consider the claim under the Illinois Consumer Fraud and Deceptive Business Practices Act (Count V).

The parties take it as a given that Illinois law applies to the state-law claims.  *See* Def.'s Mem., at 1 (Dckt. No. 49); Pls.' Resp., at 1 (Dckt. No. 51).  So this Court will too.

## I.    **Breach of Express Warranty (Count II)**

The Gurrolas bring an express-warranty claim based on the New Vehicle Limited Warranty.  They allege that Ford breached the warranty by failing to pay for the service to bring the RV into alignment.  *See* Am. Cplt., at ¶¶ 67–74 (Dckt. No. 45).

Ford responds that the Gurrolas failed to give notice of the breach before filing suit.  And even if the Gurrolas had given notice, Ford argues that it wouldn't matter because the warranty didn't cover the repairs anyway.

This Court doesn't need to get into the scope of the warranty.  The Court agrees that the Gurrolas failed to give notice as required by Illinois law.

Illinois law requires buyers to provide notice before suing for breach of warranty.  That obligation covers both express warranties and implied warranties.  No notice, no claim.

"[T]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from *any* remedy."  *See* 810 ILCS 5/2-607(3)(a) (emphasis added); *see also Maldonado v. Creative Woodworking Concepts, Inc.*, 694 N.E.2d 1021, 1025 (Ill. App. Ct. 1998) ("In every action for breach of warranty, notice is an essential element . . . .  Section 2-607(3)(a) applies to [the] beneficiaries of an implied or express warranty . . . .").

A buyer claiming breach of warranty must "directly notify the seller of the troublesome nature of the transaction or be barred from recovering for a breach of warranty." *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 589 (Ill. 1996).

The buyer needs to do more than simply inform the seller of the mechanical problems. The buyer needs to put the seller on notice that the buyer believes that the seller breached a warranty. "The notice 'of the breach' required is not of the facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of [the] buyer's claim that they constitute a breach." *Id.* at 590.

Giving notice about a general problem that affects a group of people isn't good enough. Illinois law requires specifics and granularity. "[T]he manufacturer [must be] somehow apprised of the trouble with the *particular product* purchased by a *particular buyer*." *Id.* (emphasis added). It's the difference between telling a manufacturer that a certain type of vehicle has problems, and telling a manufacturer that Bob's vehicle has a problem.

This requirement exists "to encourage pre-suit settlement negotiations." *In re McDonald's French Fries Litig.*, 503 F. Supp. 2d 953, 956 (N.D. Ill. 2007); *see also* 810 ILCS 2/607 cmt. 4 ("The notification . . . need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.").

The Gurrolas agree that Illinois law requires pre-suit notice. *See* Pls.' Resp., at 5–6 (Dckt. No. 51). But they believe that they provided notice in two ways. First, their lawyers attempted to settle their warranty claims on a class-wide basis before filing suit. Second, the Gurrolas took their RV to Hawk Ford, a Ford dealership, for repairs.

This Court sees things differently. The Gurrolas didn't provide notice to Ford, as Illinois law requires. The settlement talks between counsel don't count as notice because they discussed the claims of a class, not the claims of the Gurrolas in particular. Taking a car to a Ford dealership isn't the same thing as giving notice to the Ford Motor Company, either.

## A.    Settlement Communications

The Gurrolas contend that they gave notice to Ford during pre-suit settlement discussions. One can imagine a situation where lawyers could give notice as contemplated by the statute. But that's not what happened here.

Illinois law requires notice about a "particular buyer." *See Connick*, 675 N.E.2d at 590 (finding notice unsatisfied in a class action even where the defendant "was aware of [] safety concerns," as evidenced by unfavorable publicity and "settlement agreements with several states").

It isn't good enough to tell a manufacturer that consumers in general are having problems with a product. "[E]ven if a manufacturer is aware of problems with a particular product line," they must "be notified that *this particular transaction* is troublesome and must be watched." *Id.* (emphasis in original) (cleaned up).

The Gurrolas didn't satisfy that requirement. They point to an exchange of emails between their lawyers and counsel for Ford in April 2023, meaning one month before the Gurrolas filed suit. *See* Pls.' Resp., Ex. 1 (Dckt. No. 51-1).

The emails included a draft of a proposed class action settlement, entitled Memorandum of Understanding. *Id.* The Memorandum of Understanding didn't mention the Gurrolas. Instead, it swept broadly, covering all "Ford owners and lessees of Covered Vehicles." *Id.*

By the look of things, the accompanying email chain did not mention the Gurrolas, either. The subject of the email was "Boyle v. Ford," meaning the case in the Sixth Circuit. *Id.*

As an aside, in their filing, the Gurrolas didn't attach the full email string. *Id.* They filed page "1 of 2," and this Court doesn't have the full email from counsel for the Gurrolas (meaning the second page). This Court has no reason to think that counsel identified themselves as counsel for the Gurrolas, as opposed to counsel for a class of RV owners.

But as far as this Court can tell, the emails said nothing about the Gurrolas in particular. Based on the context, it appears that counsel reached out to Ford about a proposed class action settlement. Ford's counsel responded: "Ford is not interested in any settlement that includes classwide relief. However, we are willing to evaluating the individual claims of each of your clients, just as we evaluated Mr. Boyle's." *Id.*

The Gurrolas' counsel responded: "Thanks John, understood. We will move forward accordingly." *Id.*

If counsel said anything to Ford about the Gurrolas in particular, this Court hasn't seen it. This Court can only go with what it has. And this Court does not have anything showing that Ford heard anything about any problems with the Gurrolas' vehicle.

In their brief, the Gurrolas quote the email that they sent to Ford, and quote a passage that wasn't filed as part of the attachment. Even so, the quotation solidifies the conclusion that counsel reached out to Ford about problems encountered by RV owners generally, without mentioning the Gurrolas. The passage referred to "dozens of cutaway owners," without mentioning any owner in particular (except Mr. Boyle):

> We have been contacted by *dozens of cutaway owners* covering several additional states now who are similarly situated to Mr. Boyle. While we can certainly start filing these cases, we wanted to reach out to you before doing so. I wanted to touch base about potentially resolving this case (and

13

> the additional cases) along the lines I previously proposed that Ford
> rejected – generally as set forth below.

*See* Pls.' Resp., at 6 (Dckt. No. 51) (emphasis added).

The Gurrolas believe that the email from counsel satisfied the notice requirement because counsel attempted to settle claims on behalf of a class, including the Gurrolas. As they see things, the "purpose of pre-suit notice" was to encourage settlement negotiations. *See In re McDonald's French Fries Litig.*, 503 F. Supp. 2d at 956.

Maybe a desire to promote settlement is a driving force behind the pre-suit notice requirement. But it's not the only consideration. Illinois law requires consumer-specific notice, not class-wide notice. The Gurrolas haven't come forward with any Illinois case law supporting the notion that giving notice on behalf of a class satisfies the notice requirement.

Federal courts aren't in the business of creating new exceptions to state law based on underlying policy reasons. *See, e.g.*, *Gray v. Wyeth*, 2008 WL 11509055, at *9 (S.D. Ill. 2008) ("[T]he power of a federal court to craft state law is of necessity tightly circumscribed. . . . 'Respect for state courts as the primary expositors of state law counsels restraint by federal courts in announcing new state law principles.'") (cleaned up) (citations omitted).

Telling Ford about the problems of consumers generally does not satisfy the notice requirements under Illinois law. The Gurrolas needed to give notice about their problems in particular. They didn't.

## B. Communications with Hawk Ford

The Gurrolas also argue that they provided notice to Ford when they took their RV for service at the Hawk Ford dealership. *See* Pls.' Resp., at 7 (Dckt. No. 51). Not so.

14

The text of the statute requires a buyer to give notice to a "seller." "[T]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the *seller* of breach or be barred from any remedy." *See* 810 ILCS 5/2-607(3)(a) (emphasis added).

The word "seller" sounds like it refers to the entity that did the selling. And if that's what the statute meant, then the Gurrolas' claim would be sunk from the get-go. The Gurrolas bought the vehicle from General RV, not Hawk Ford. *See* Am. Cplt., at ¶ 16 (Dckt. No. 45).

But that's not what "seller" means. The Illinois Supreme Court has interpreted that word to mean something different than common parlance. The "seller" is the entity that gives the warranty.

In *Connick*, the Illinois Supreme Court addressed a proposed class of owners who bought Suzuki motorcycles from authorized Suzuki dealers. *See Connick*, 675 N.E.2d at 589. The authorized dealers sold the motorcycles directly to the owners.

The owners gave notice to the Suzuki dealers, but not to Suzuki itself. The Illinois Supreme Court held that the plaintiffs did not give notice to the "seller" because they did not give notice to Suzuki, meaning the manufacturer that gave the warranty. *Id.* at 590–91. The plaintiffs "failed to allege direct notice to Suzuki," so the "complaint did not satisfy the section 2-607 notice requirement." *Id.* at 591; *see also Karpowicz v. Gen. Motors Corp.*, 1997 WL 285943, at *7 (N.D. Ill. 1997) (discussing *Connick* before determining that "the plaintiff's communications with the dealers were insufficient to satisfy [the warranty] notice requirement" because "only his direct communications with GM are sufficient").[1]

---

[1] The *Karpowicz* court suggested that notifying the selling dealer could have satisfied section 2-607 if the selling dealer were the agent of the manufacturer that gave the warranty. Here, the Gurrolas do not allege that Hawk Ford was an agent of Ford Motor Company. *See generally* Am. Cplt. (Dckt. No. 45); Pls.' Resp. (Dckt. No. 51).

In other words, the *Connick* court interpreted the word "seller" to require notice to the manufacturer that gave the warranty, not the consumer-facing dealer that completed the sale. *See Connick*, 675 N.E.2d at 591. In *Connick*, notice to the dealers was not enough, even though the dealers sold the motorcycles to the owners.[2]

Here, Ford gave the warranty, not Hawk Ford. So any notice to Hawk Ford is not notice to the "seller" within the meaning of the statute.

If anything, the Gurrolas did even *less* than the plaintiffs in *Connick*. The owners in *Connick* gave notice to the dealership that sold them the motorcycles. That notice wasn't enough in *Connick*, but in the case at hand, the Gurrolas did even less. At best, they gave notice to a dealership that did repairs, not the dealership that sold them the RV. *See* Pls.' Resp., at 7 (Dckt. No. 51).

Giving notice to a Ford dealership isn't the same thing as giving notice to Ford. A franchisor and a franchisee are not the same thing. Entire branches of the law are built on the difference.

What's more, even if Hawk Ford fell within the definition of "seller," the Gurrolas did not satisfy the notice requirement. Again, giving notice of a problem isn't enough – the buyer must give notice of a breach of warranty. *See Connick*, 675 N.E.2d at 590. And here, the complaint alleges no such thing. The complaint does not allege that the Gurrolas gave notice to Hawk Ford that Ford had breached the warranty.

The Gurrolas point out that the warranty required them to get warranty repairs at an authorized Ford dealer. *See* Pls.' Resp., at 7–8 (Dckt. No. 51). Maybe so. But that's beside the

---

[2] The Court notes that *Connick* does not explicitly state whether the plaintiffs sought warranty service from the selling Suzuki dealers. In any case, *Connick* is clear that notice to the manufacturer that gave the warranty is required. *See Connick*, 675 N.E.2d at 591.

point. Illinois law requires notice to the "seller," meaning the entity that gave the warranty. Getting work done at a dealership is not the same thing as giving notice of a breach to the manufacturer that gave the warranty.

The Gurrolas failed to give notice as required by Illinois law, so the express warranty claim (Count II) is dismissed.

## II.  Breach of Implied Warranty (Counts III and IV)

The Gurrolas also bring two implied-warranty claims against Ford. They allege that Ford breached the implied warranty of merchantability, and the implied warranty of fitness for a particular purpose. *See* 810 ILCS 5/2-314, 5/2A-212, 5/2-315.

The claim about the implied warranty of merchantability is about the safety of using the RV. The complaint alleges that Ford warranted that the Cutaway was "fit and safe" for its intended use, including "operation at loads up to the stated GVWR," meaning 14,500 lbs. *See* Am. Cplt., at ¶ 79 (Dckt. No. 45). But in reality, the RV pulls significantly when it is fully loaded, making it unsafe to drive. *Id.* at ¶ 80.

The claim about the implied warranty of fitness for a particular purpose is similar. The complaint alleges that final-stage manufacturers "relied on Ford to ensure the Cutaway was able to serve the identified, specific purpose, of a motorhome" with a GVWR of 14,500 lbs. *Id.* at ¶¶ 85–87. Ford impliedly warranted that the Cutaway was fit for that purpose. *Id.* at ¶ 88.

The implied-warranty claims don't get very far, for the same reason why the express warranty claims stalled. The notice requirement applies to both express-warranty claims and to implied-warranty claims. *See Maldonado*, 694 N.E.2d at 1025 ("In *every* action for breach of warranty, notice is an essential element . . . . Section 2-607(3)(a) applies to [the] beneficiaries of

an implied or express warranty . . . .") (emphasis added). The Gurrolas didn't give notice to Ford, so they can't bring their implied-warranty claims, either.

The implied-warranty claims suffer from a second problem. The complaint does not satisfy the privity requirement.

Illinois law requires privity for breach-of-implied-warranty claims that allege only economic damages. *See Manley v. Hain Celestial Grp., Inc.*, 417 F. Supp. 3d 1114, 1124 (N.D. Ill. 2019). In other words, a plaintiff can bring an implied-warranty claim only against the entity that sold the product directly to the plaintiff.

"There is no contractual privity between a manufacturer and a person who buys from an independent dealer." *See Rodriguez v. Ford Motor Co.*, 596 F. Supp. 3d 1050, 1056 (N.D. Ill. 2022). The privity requirement means that "only the immediate seller can be sued." *See Ali v. Volkswagen Grp. of Am., Inc.*, 559 F. Supp. 3d 723, 733–34 (N.D. Ill. 2021) (collecting cases).

The existence of a warranty, standing alone, does not mean that there is privity between the buyer and the manufacturer. A "mere written warranty included at the time of purchase is insufficient to create privity." *Pappas v. Jayco, Inc.*, 2016 WL 9049639, at *3 (C.D. Ill. 2016) (rejecting claims of privity between an RV purchaser and manufacturer).

Some states have jettisoned the privity requirement, but Illinois hasn't. The Illinois Supreme Court "has consistently declined to abolish the [vertical privity] doctrine in cases where purely economic damages are sought." *See Mekertichian v. Mercedes-Benz U.S.A., LLC*, 807 N.E.2d 1165, 1168 (Ill. App. Ct. 2004); *see also Szajna v. Gen. Motors Corp.*, 503 N.E.2d 760, 767 (Ill. 1986) ("We therefore decline to abolish the privity requirement in implied-warranty economic-loss cases.").

That privity rule applies to the Gurrolas. They seek economic damages, not damages for personal injury. *See* Am. Cplt., at ¶¶ 74, 81, 90 (Dckt. No. 45). So privity is required.

The complaint reveals a lack of privity. The Gurrolas bought the RV from General RV, not from Ford.

The Gurrolas do not dispute the lack of privity. *See generally* Pls.' Resp., at 8–10 (Dckt. No. 51). Instead, they argue that two exceptions apply. They argue that exceptions apply for direct dealing, and for a third-party beneficiary.

As an initial matter, one wonders if Illinois law continues to recognize exceptions to the privity rule. It is "far from certain that Illinois permits *any* exception to the vertical privity requirement for breach of implied warranty in light of the decisions of the Illinois Supreme Court . . . ." *See Caterpillar, Inc. v. Usinor Industeel*, 393 F. Supp. 2d 659, 678 (N.D. Ill. 2005) (emphasis added) (citations omitted); *see also Manley*, 417 F. Supp. 3d at 1123–24 (questioning "if the direct-dealing, third-party beneficiary exception . . . survives").

Time and again, the Illinois Supreme Court has "hammered home the necessity of privity" for implied-warranty claims. *See Manley*, 417 F. Supp. 3d at 1124 (collecting cases); *see also Szajna*, 503 N.E.2d 760 at 311 ("We therefore decline to abolish the privity requirement in implied-warranty economic-loss cases."); *Rothe v. Maloney Cadillac, Inc.*, 518 N.E.2d 1028, 1030 (Ill. 1988) ("[T]he UCC article II implied warranties give a buyer of goods a potential cause of action only against his immediate seller.").

The parties do not cite any Illinois cases since the turn of the century applying the direct-dealing exception or the third-party-beneficiary exception. After poking around, this Court has not found any cases, either. If the exceptions still exist under Illinois law, the state courts have gone quiet.

19

Still, a number of federal courts sitting in diversity have continued to apply the exceptions. *See, e.g.*, *Rodriguez*, 596 F. Supp. 3d 1050; *Manley*, 417 F. Supp. 3d 1114; *Redmon v. Whirlpool Corp.*, 2020 WL 9396529 (N.D. Ill. 2020); *Pickens v. Mercedes-Benz USA*, 2021 WL 5050289 (N.D. Ill. 2021); *Davy Cho v. Hyundai Motor Co.*, 636 F. Supp. 3d 1149 (C.D. Cal. 2022).

Maybe the citations are simply a matter of string cite inertia. It is possible that federal courts have continued to drift in the same direction, assuming that the current of state law is going the same way. But when state courts haven't chimed in for a long time, and when the last state case is far off in the distance, one has to wonder if federal courts have gone too far or lost their bearings.

For the sake of argument, this Court will assume that the exceptions continue to exist. Even if the exceptions exist, they do not save the day.

## A. The Direct-Dealing Exception

The first possibility is the direct-dealing exception. "[A]s the name suggests, the direct-dealing exception applies only where the ultimate purchaser of the product communicated *directly* with the manufacturer." *Rodriguez*, 596 F. Supp. 3d at 1056 (emphasis in original).

An early case illustrates the point. *See Abco Metals Corp. v. J.W. Imports Co.*, 560 F. Supp. 125 (N.D. Ill. 1982), *aff'd sub nom. Abco Metals Corp. v. Equico Lessors, Inc.*, 721 F.2d 583 (7th Cir. 1983). *Abco Metals* involved the sale of a wire chopper (*i.e.*, machinery for recycling metal). When the machinery didn't work, the buyer sued the distributor, as well as the foreign manufacturer.

The court denied the manufacturer's motion to dismiss based on a lack of privity. The court relied on communications that took place between the buyer (Abco) and the foreign company (Laursens).

The manufacturer "was present at the meeting where the purchase of the wire chopper was discussed, and he promised the machine would meet Abco's requirements." *Id.* at 128. When the buyer told the manufacturer about the problem, the manufacturer "assured Abco that the chopper would be fixed, and evidently took some steps to do so, though the attempted repairs failed." *Id.* The complaint survived because the purchaser "alleged facts indicating that there was a direct relationship between it and the manufacturer." *Id.*

That case is a far cry from the situation at hand. The Gurrolas don't allege that they had any comparable direct communications with Ford.

The Gurrolas point to the warranty itself as an example of a direct communication. It's hard to see how the existence of a warranty could suffice. That's like saying that you need privity for a warranty claim, unless there's a warranty.

The Illinois Supreme Court requires privity for an implied-warranty claim. If a buyer can get around the privity requirement for a warranty claim by pointing to the warranty itself, then the privity requirement isn't much of a requirement. Everything would go down the hatch, and the exception would swallow the rule.

Next, the Gurrolas rely on a case from this district that hasn't received the warmest judicial reception. In *Elward v. Electrolux Home Prod., Inc.*, 214 F. Supp. 3d 701 (N.D. Ill. 2016), a district court held that the direct-dealing exception applied based on the manufacturer's "advertisements, warranty forms, and registration cards." *Id.* at 705.

21

Other federal courts have declined to follow *Elward*'s relatively loose formulation of the direct-dealing exception. *See Redmon*, 2020 WL 9396529, at *5 (collecting cases) ("The Court respectfully declines to follow [three non-binding federal district court decisions including *Elward*] because it concurs with other federal district courts that are unpersuaded the Illinois Supreme Court would conclude that ['written advertisements and warranties'] alone give rise to 'direct dealings.'"); *see also Davy Cho*, 636 F. Supp. 3d 1176 ("[C]ourts applying Illinois law overwhelmingly refuse to follow *Elward*'s reasoning . . . .").

This Court declines to adopt *Elward*. But even if that case applied, it wouldn't lend a hand. The complaint does not allege that the Gurrolas saw any of the advertisements in question. That is, the Gurrolas do not allege that they read any advertisements about the load-bearing capabilities of the RV. *See Pickens*, 2021 WL 5050289, at *1–2 ("Pickens, however, does not allege that Mercedes made any specific representations in advertising or otherwise regarding the glass in its cars' sunroofs. . . . Beyond advertising and the fact that Mercedes manufactured his car, Pickens does not allege a relationship with Mercedes. Courts in this district have found that this kind of relationship between a car manufacturer and a car consumer is insufficient to allege an exception to the privity requirement.").

In a similar vein, the Gurrolas argue that they had direct dealings with Ford because they took their RV to Hawk Ford. That's doubly wrong. Communicating with a Ford dealer isn't a direct dealing with Ford – it's not direct, and it's not a dealing with Ford. Again, Ford dealerships and the Ford Motor Company aren't the same thing. *See Rodriguez*, 596 F. Supp. 3d at 1056 ("[The plaintiff] had no contact with Ford. He had contact with the Hopkins Ford dealership in Elgin, but this is insufficient under the controlling Illinois law.").

In sum, to the extent that the exception still has legs, the complaint fails to allege any facts that could satisfy the direct-dealing exception.

### B.    The Third-Party-Beneficiary Exception

The other possibility is the so-called third-party-beneficiary exception.

The third-party-beneficiary exception applies when "'the manufacturer knew the identity, purpose and requirements' of the customer and 'manufactured or delivered the goods specifically to meet those requirements.'"  *See Redmon*, 2020 WL 9396529, at *5 (quoting *Frank's Maint. & Eng'g, Inc. v. C. A. Roberts Co.*, 408 N.E.2d 403, 412 (Ill. App. Ct. 1980)).  The exception applies when "a seller makes a product for a user who is not a direct buyer, but with whom the seller has direct dealings."  *See Manley*, 417 F. Supp. 3d at 1123 (quoting *Rhodes Pharmacal Co. v. Cont'l Can Co.*, 219 N.E.2d 726, 732 (Ill. App. Ct. 1966)).

If you think that the third-party-beneficiary exception sounds a lot like the direct-dealings exception, you're not alone (and you're paying attention).  The exceptions sound similar because they both come from the same case.  *See Rhodes Pharmacal Co. v. Cont'l Can Co.*, 219 N.E.2d 726 (Ill. App. Ct. 1966).  If the two exceptions are separate roads, they seem to merge, and it's not always easy to see where one road ends and another road begins.

"Much as all roads once led to Rome, the cases that mention a 'direct-dealing' exception to the privity requirement under Illinois law seem to trace back to one case."  *See Manley*, 417 F. Supp. 3d at 1123.  All roads lead to *Rhodes*, and it's a muddled, muddy track.

The third-party-beneficiary exception does not apply here, for the same reasons why the direct-dealing exception does not apply.  Again, the Gurrolas had no direct dealings with Ford.  Ford did not know the Gurrolas at all, much less "manufacture[] or deliver[]" the Cutaway "specifically to meet [their] requirements."  *See Redmon*, 2020 WL 9396529, at *5.

23

The Gurrolas believe that Ford intended them as third-party beneficiaries because "Ford knew and understood the Cutaway would be utilized by consumers as a motorhome," and "Ford specifically marketed and sold the Cutaway for [the Gurrolas'] purpose, use as a motorhome." *See* Pls.' Resp., at 9 (Dckt. No. 51).

But the third-party-beneficiary exception does not contemplate such a mundane relationship between manufacturer and end consumer. The third-party-beneficiary exception is about the requirements of a particular customer, not the requirements of consumers generally. *See Manley*, 417 F. Supp. 3d at 1124 (holding that the third-party-beneficiary exception did not apply because the complaint did not allege that the "defendant manufactured the product *to her specifications* but sold it to her through a middle man") (emphasis added). The consumer in *Manley* bought an "off the shelf" bottle of sunscreen. *Id.* And here, the Gurrolas bought an off-the-lot RV.

In sum, the Gurrolas did not have privity with Ford, and the exceptions to the privity rule do not apply. The implied-warranty claims (Counts III & IV) are dismissed.

### III.    Magnuson-Moss Warranty Act (Count I)

The next claim is a federal claim under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2310 *et seq.* The dismissal of the state-law warranty claims requires the dismissal of the federal claim, too.

The Magnuson-Moss Warranty Act creates a private right of action for damages arising from a breach of warranty. *See* 15 U.S.C. § 2310(d)(1). But a federal warranty claim is linked to a state warranty claim. They rise or fall together.

A "consumer's ability to state a claim under the [Magnuson-Moss Warranty] Act 'is dependent on the existence of an underlying viable state-law warranty claim.'" *See Lederman v.*

*Hershey Co.*, 2022 WL 3573034, at *6 (N.D. Ill. 2022) (quoting *Schiesser v. Ford Motor Co.*, 2016 WL 6395457, at *4 (N.D. Ill. 2016)).  "[W]ithout a viable state-law claim, [the plaintiff's] claim under the Magnuson Moss Warranty Act also fails."  *See Matthews v. Polar Corp.*, 2023 WL 4534543, at *10 (N.D. Ill. 2023) (citing *Lederman*, 2022 WL 3573034, at *6).

Here, the complaint fails to state an express-warranty claim or an implied-warranty claim under Illinois law.  The state-law claims don't have a leg to stand on, so the federal claim falls too.

The Gurrolas rely on an Illinois case for the notion that "the privity requirement has been 'relaxed' when (1) a manufacturer has extended a written warranty with a product; and (2) a consumer brought an action against the manufacturer under the Magnuson–Moss Act."  *See Shoop v. DaimlerChrysler Corp.*, 864 N.E.2d 785, 792 (Ill. 2007); Pls.' Resp., at 16–17 (Dckt. No. 51).  The Gurrolas believe that they fit the bill, because they received a written warranty and are bringing a claim under the Magnuson-Moss Act.

Not so.  The Magnuson-Moss Act is a federal statute.  According to the Seventh Circuit, "a valid claim for breach of the implied warranty of merchantability under the Magnuson-Moss Act *must* allege privity in accordance with the applicable state law."  *See Voelker v. Porsche Cars N. Am.*, 353 F.3d 516, 525 (7th Cir. 2003) (emphasis added).

The viability of a state-law claim should not depend on whether it is paired with a federal claim.  If a state-law claim cannot stand on its own two feet, then adding a federal claim cannot prop up the state-law claim.

The viability of the federal claim depends on the viability of the state-law claim, not the other way around.  *Id.*  A state-law claim can't become viable based on the existence of a federal

claim if the viability of the federal claim depends on the viability of the state-law claim. Otherwise, it becomes a whirlpool of circularity.

In any event, a lack of privity was only one of the problems that doomed the complaint at hand. The Gurrolas did not satisfy the notice requirement, either. So the federal claim is going nowhere.

## IV. Illinois Consumer Fraud and Deceptive Business Practices Act (Count V)

The last remaining claim falls under the Illinois Consumer Fraud and Deceptive Business Practice Act ("ICFA"). That statute prohibits engaging in "unfair or deceptive acts or practices." *See* 815 ILCS 505/2.

A claim under the ICFA requires a plaintiff to show "(1) a deceptive act or practice by the defendant; (2) the defendant intended that the plaintiff rely on the deception; (3) the deceptive act occurred in a course of conduct involving trade or commerce; and (4) actual damages to the plaintiff; (5) proximately caused by the deceptive act." *See Phila. Indem. Ins. Co. v. Chicago Title Ins. Co.*, 771 F.3d 391, 402 (7th Cir. 2014).

The claim fails for at least two reasons. For starters, the complaint does not allege a deceptive act or practice. The complaint does not allege proximate causation, either.

### A. Deceptive Acts or Practices

The claim cannot get off the ground for a basic reason. The complaint does not allege a deceptive act or practice. The claim is about an advertisement for a product that the Gurrolas didn't buy. The advertisement for the product that they *did* buy wasn't misleading.

A plaintiff cannot bring a claim under the ICFA without alleging a deceptive act or practice. The statutes applies to deceptive statements that are "likely to deceive a reasonable consumer." *See Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020).

26

The "reasonable consumer" standard "requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 474–75 (7th Cir. 2020) (quoting *Beardsall*, 953 F.3d at 972–73; *see also Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) ("Courts apply a 'reasonable consumer' standard to analyze the likelihood of deception.") (citations omitted).

A deceptive statement can be "either (1) literally false, or (2) likely to mislead (either through a statement or material omission) a reasonable consumer." *See Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). A misleading statement does not need to be false. An ICFA claim "may be satisfied by proof that a statement is likely to mislead a reasonable consumer, even if the statement is literally true." *Id.* at 762–63.

That said, "unreasonable or fanciful interpretations of labels or other advertising" cannot serve as the basis for a deceptive act or practice. *See Bell*, 982 F.3d at 477–78. A statement is not deceptive "when the plaintiff's interpretation is so facially illogical, implausible, or fanciful that no reasonable consumer would think it – and [] dismissal is warranted in those circumstances." *Id.* at 493 (Kanne, J., concurring).

"[T]o adequately plead an ICFA claim, it is not enough to allege that the product misled a particular plaintiff. Idiosyncratic readings and unreasonable interpretations of a label don't cut it. What matters is how a reasonable consumer would read the packaging." *Polar Corp.*, 2023 WL 4534543, at *6.

"Where plaintiffs base deceptive advertising claims on unreasonable or fanciful interpretations of labels or other advertising, dismissal on the pleadings may well be justified." *See Bell*, 982 F.3d at 477.

27

The claim at hand relies on a Ford advertisement for a 2021 E-Series Cutaway. In fact, the complaint includes a glossy picture of the advertisement. *See* Am. Cplt., at ¶ 38 (Dckt. No. 45). The advertisement said that the 2021 E-Series came with a "Twin I-Beam Independent Front Suspension 'with caster/camber adjustment.'" *Id.*; *see also id.* at ¶¶ 9, 18, 52. The model year – 2021 – appears front and center.

But there's a problem. And it's a big one.

The Gurrolas didn't buy a 2021 E-Series Cutaway. They bought a "*2022* Ford E-series (E-450) Cutaway." *Id.* at ¶ 16 (emphasis added). The Gurrolas are relying on an advertisement for a 2021 Cutaway, but they bought a 2022 Cutaway. In other words, the Gurrolas are relying on an advertisement for a product that they didn't buy.

To make matters worse, the advertisement for the 2022 model said nothing about the ability to adjust the suspension. The complaint attached a promotional brochure for the 2022 E-Series. That advertisement did mention the suspension, under the heading "GREAT RIDE, STEERING AND HANDLING." *See* Am. Cplt., Ex. B, at 5 (Dckt. No. 45-2, at 6 of 9); *see also id.* at 6 (describing the "SUSPENSION, FRONT"). But the brochure said nothing about the suspension being adjustable.

The complaint also attached the Ford window sticker, entitled "VEHICLE DESCRIPTION E-SERIES." *See* Am. Cplt., Ex. A, at 2 (Dckt. No. 45-1). The window sticker itemized the "STANDARD EQUIPMENT." *Id.* The list included "TWIN I-BEAM INDEPENDENT FRONT SUSPENSION," with no reference to adjustability. *Id.*

Putting it all together, the Gurrolas bought a 2022 E-Series Cutaway. Ford's advertisements for the 2022 E-Series Cutaway said nothing about the ability to adjust the

suspension. So Ford did not deceive them. The advertisement for the 2021 E-Series Cutaway cannot save the day, because the Gurrolas never bought a 2021 E-Series Cutaway.

In *Boyle*, the Sixth Circuit offered an additional rationale for rejecting a comparable claim under a Florida statute. *See Boyle*, 2024 WL 1406401, at *5–6. Again, *Boyle* involved the same basic claim, meaning a claim about RVs built on a Ford Cutaway chassis that pulled to one side.

The Sixth Circuit concluded that the representation about the adjustability of the caster and camber was not misleading. They were, in fact, adjustable – albeit with aftermarket parts. "It's not likely that Ford's statements would mislead consumers because the caster and camber are in fact adjustable, even if they require aftermarket parts, which Boyle concedes." *Id.* at *6.

This Court is not hitching its wagon to that holding. The Cutaway didn't come with aftermarket parts, so the Cutaway wasn't adjustable as is. It wasn't adjustable unless the consumer made another purchase. And installing the aftermarket parts came with a big downside – it would void the warranty.

One wonders if a reasonable consumer would feel misled after learning that the suspension was adjustable, but only if the consumer bought something else from someone else *and* lost the warranty.

This Court doesn't need to go there. It is enough to hold that the Gurrolas have no claim because they cannot rely on a 2021 advertisement about a 2021 vehicle when they bought a 2022 vehicle.

### B.    Causation

The claim also fails because the complaint fails to allege proximate causation. The complaint does not allege that the Gurrolas ever saw the advertisement.

29

The Illinois Supreme Court recently highlighted the importance of proximate causation under the ICFA. Proximate causation requires real-world deception. And real-world deception requires that the plaintiff actually heard the statement in question.

"In order to establish the element of proximate causation, a plaintiff must prove that it was actually deceived by the misrepresentation. If the plaintiff has neither seen nor heard a deceptive statement, it cannot have relied on the statement and, consequently, cannot prove that the statement was the proximate cause of its injury." *Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*, 241 N.E.3d 454, 462 (Ill. 2024); *see also De Bouse v. Bayer*, 922 N.E.2d 309, 316 (Ill. 2009) ("The basic principle in each of the foregoing cases is that to maintain an action under the Act, the plaintiff must actually be deceived by a statement or omission that is made by the defendant. If a consumer has neither seen nor heard any such statement, then she cannot have relied on the statement and, consequently, cannot prove proximate cause.").

If deception happened in a forest, and no one heard it, it doesn't sound like a claim.

Here, the complaint points to the statement in the advertisement about the "Twin I-Beam Independent Front Suspension 'with caster/camber adjustment.'" *See* Am. Cplt., at ¶¶ 9, 18, 38, 52 (Dckt. No. 45). But the complaint noticeably stops short of alleging that the Gurrolas ever read that advertisement before buying the RV.

The complaint does not allege that the Gurrolas ever saw the statement in question, so the complaint fails to state a claim. *See Garland v. Children's Place, Inc.*, 2024 WL 1376353, at *6 (N.D. Ill. 2024) ("[The plaintiffs] cannot premise their ICFA claims on these statements because they did not read or otherwise become aware of either statement before making their purchases.").

The Gurrolas point out that Illinois law recognizes an "indirect deception" theory. *See* Pls.' Resp., at 19 (Dckt. No. 51). That's true, but beside the point.

The indirect-deception theory is about indirect communications between a defendant and a plaintiff. *See De Bouse*, 922 N.E.2d at 316. It doesn't matter if the communications get there directly or indirectly. What matters is that the plaintiff eventually heard them, and suffered a harm. "'[I]t is enough that the statements by the defendant be made with the intention that it reach the plaintiff and influence his action and that *it does reach him* and that he does rely upon it, *to his damage*.'" *Id.* (quoting *Shannon v. Boise Cascade Corp.*, 805 N.E.2d 213, 218 (Ill. 2004)) (emphasis added).

The Gurrolas cannot point to an omission, either. An omission might provide the basis for a claim if the Gurrolas read a statement from Ford, and that statement omitted material information. But here, the Gurrolas don't allege that they ever read any statement from Ford about the suspension on the RV.

In sum, the complaint fails to allege that the Gurrolas ever saw the advertisement in question, so it fails to state a claim under the ICFA.

## Conclusion

For the foregoing reasons, Defendant Ford Motor Company's motion to dismiss (Dckt. No. 48) is hereby granted.

Date: March 18, 2025

_____
Steven C. Seeger
United States District Judge